Filed 3/23/21  In re M.V. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.V., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,  Plaintiff and Respondent,  v.  D.V.,  Defendant and Appellant. | E075936  (Super.Ct.No. RIJ1800355)  OPINION |

APPEAL from the Superior Court of Riverside County.  Cheryl C. Murphy, Judge.

Affirmed.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and

Appellant.

Gregory P. Priamos, County Counsel, James E. Brown, Anna M. Marchand and

Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

On August 25, 2020, the juvenile court denied D.V.'s (mother) modification petition and terminated parental rights to her son under Welfare and Institutions Code[1] section 366.26. She appeals, contending the court erred by (1) denying her section 388 petition to reinstate reunification services, (2) finding the beneficial parent-child relationship exception to adoption did not apply, and (3) refusing to order guardianship as the permanent plan. We reject her contentions and affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

### A. *Detention.*

On May 28, 2018, M.V. (the child) came to the attention of the Riverside County Department of Public Social Services (DPSS) when mother's cousin reported mother was not bonding with the child, holding him, or feeding him. Mother had gone to the hospital asking for help. Following an evaluation, she was placed on a section 5150[2] hold and transported to emergency treatment services. A nurse reported that because mother was hearing voices telling her to harm herself and her child, she was assigned a one-on-one staff member.

The social worker spoke to the cousin, who reported mother had been living with her since November 2017. She stated mother was "usually very calm, however recently she has been having outbursts of yelling." The last time mother exhibited these outbursts

---

[1] Unless otherwise indicated, all additional statutory references are to the Welfare and Institutions Code.

[2] Section 5150 allows for the involuntary hospitalization of a person who "as a result of a mental health disorder, is a danger to others, or to himself or herself." (§ 5150, subd. (a).)

was two years earlier, upon the death of her mother. The cousin was providing the majority of care for the child, but she was no longer able to do so, no other relative wanted custody of him, and mother was no longer welcome in the cousin's home.

The social worker spoke with mother, who showed no concern for the child's care or needs. She had difficulty concentrating on the questions being asked, as well as making decisions. The mother spoke slowly, had a "flat affect," and stated she had not been sleeping. She identified the father as Mr. P. but reported she was never in a relationship with him. Mother explained her presence at the hospital was because she could not sleep, she was yelling that she wanted to give away her baby, and she was hearing voices telling her to commit suicide and hurt her baby.

On May 30, 2018, DPSS filed a dependency petition under section 300, subdivisions (b)(1) (failure to protect) and (g) (no provision for support). The petition alleged mother suffered from unresolved mental health issues resulting in numerous psychiatric hospitalizations, mother and father engaged in domestic violence, and neither was willing or able to provide care and support for the child. The child was detained in a foster home, and a jurisdictional hearing was set.

*B.     Jurisdiction/Disposition Reports and Hearing.*

According to the jurisdiction/disposition report filed June 19, 2018, and the addendums filed July 20, and August 23, 2018, mother suffered from a learning disability and had been in special education since the second grade. When she was 13 years old, she began hearing voices telling her to hurt herself. She started therapy and was given medication; however, there were periods when she was hospitalized or had suicidal

3

ideations.  When she was 22 years old, her mother passed away and the voices returned,

resulting in her being diagnosed with depression and being sent to a psychiatric hospital.

At a residential treatment facility, mother was diagnosed with "psychosis unspecified."

The social worker reported that mother appears to be managing her mental health

symptoms as she presents with appropriate affect and is joyful when she interacts with her

child.  During the supervised visits, mother fed, rocked, cradled, and talked to the child.  A

paternity test revealed that Mr. P. was not the biological father.  On August 8, 2018, the

child was placed with a nonrelative extended family member.  The next day, mother

reported she forgot to refill her prescription, was out of medication, and was at risk of

being homeless.

On August 28, 2018, the juvenile court dismissed Mr. P. from the petition;

determined the child came under section 300, subdivision (b)(1); declared him a

dependent of the court; removed him from mother's care; and ordered reunification

services and supervised visitation.  That same day, DPSS filed an amended petition

reflecting the court's findings and actions.

    *C.      Six-month Status Review Report and Hearing.*

According to the six-month status review report filed February 15, 2019, mother

had been living with the maternal grandfather and his female friend since August 2018.

The home was described as a trailer.  It was small and had water damage, as well as

damage caused by the maternal grandfather's attempt to make it a "two story home."

Mother was unemployed, unable to obtain supplemental security income, and she only

took her psychotropic medication on an "as needed" basis.  Mother was participating in

visitation and her services; however, she requested more time to complete her case plan because it takes her longer to complete work assignments since she has to review the material a few times in order to comprehend clearly, and she needed to find housing and employment. The social worker opined that mother's cognitive ability may be in the borderline range, and noted that mother has demonstrated tremendous effort to do what she can in order to comply with visitation and her case plan, but she needed more time. The child was doing well in his placement, and his caregivers expressed their interest in adopting him.

On February 28, 2019, the juvenile court found that mother was participating and progressing in her case plan, and there was a substantial probability the child might be returned to her care within the next six months. Thus, the court continued reunification services and ordered DPSS to provide mother with financial and nonfinancial assistance for housing.

### D. Twelve-month Status Review Reports and Contested Hearing.

According to the 12-month status review report filed July 19, 2019, DPSS recommended the juvenile court terminate reunification services, reduce visitation to once a month, and set a section 366.26 hearing. Mother continued to suffer from depression, which required medication. She was seeing a psychiatrist and living with the maternal grandfather, but she occasionally stayed with a friend when she was visiting the child. Mother remained unemployed and relied on the maternal grandfather for financial assistance.

The child had developed a very strong emotional attachment to his foster mother and was thriving with his caregivers, who regarded him as an integral member of their family. Mother continued to visit him; however, on occasion she would wonder off and leave the child alone on a swing or in a sandbox until she was reminded not to leave him alone. While mother continued to express a desire to reunify with her child, she stated she needed her family and father's family to care about him and her more.

The social worker stated that mother struggles greatly to minimally meet her own needs for shelter, food, and clothing, and mother appears overwhelmed with the pressures and responsibilities of simply caring for herself and could not appropriately care for a child. The social worker therefore opined that mother was not ready to handle the responsibilities of caring for a child, and she simply does not currently possess the capacity to effectively meet the needs of the child or to keep him safe from harm. The foster mother helped mother on numerous occasions (by providing transportation and food) and stated that if she adopts the child, she would strongly consider allowing mother to be a part of his life. On July 30, 2019, mother requested a contested status review hearing.

In the addendum report filed August 7, 2019, DPSS conveyed that mother had completed a parenting class, was learning about personal hygiene and stress management, and was consistently visiting the child; however, she had not progressed to unsupervised visitation. On August 1, 2019, mother's cousin stated that mother could live with her, and she was "somewhat certain" she could help mother find a job. DPSS recommended continuing reunification services and liberalizing visitation. On August 13, 2019, the

juvenile court ordered reunification services be continued and set an 18-month status review hearing.

###### E. Eighteen-month Status Review Reports and Hearing.

According to the 18-month status review report filed November 22, 2019, and addendum report filed January 8, 2020, DPSS once more recommended the juvenile court terminate reunification services, reduce visitation to once a month, and set a section 366.26 hearing. On August 15, 2019, mother moved in with her cousin and was working part-time at a pizza restaurant. Mother continued to take antidepressant medication; however, she disclosed that when she ran out of her medicine, she heard voices telling her to kill the child and to commit suicide, but the voices stopped when she resumed taking her medicine. Mother never completed her anger management classes.

The child continued to thrive in his placement, his caregivers remained committed to adopting him, and DPSS reported it would be emotionally traumatic to move him out of their home. Although mother loved and consistently visited the child, the social worker noticed that she was "extremely passive" with him. For example, she seemed detached "emotionally and physically" from him, was slow in responding to his attempt to gain her attention, and rarely if ever redirected him, even when he was doing potentially dangerous things. Thus, the social worker opined that due to her diminished ability to recognize environmental threats and danger, mother would place the child at risk of harm if she were to be alone in the community with him. In December 2019, mother informed the social worker that she was four months pregnant, worked full-time

at a hospital as a housekeeper, continued to take her medication, and expressed a "certain level of stress over all of her obligations."

On January 14, 2020, the juvenile court found that mother had failed to participate regularly and make substantive progress in her case plan, and there was no substantial probability of returning the child to her after another six months of services. Thus, the court terminated services and set a section 366.26 hearing.

*F.    Section 366.26 reports.*

According to the section 366.36 report filed April 30, 2020, and addendum reports filed July 13 and August 20, 2020, the child (who was then two years old) had only been in mother's custody for approximately the first 17 days of his life. On March 27, 2020, mother gave birth to another child (M.T.) and, less than one month later, she told the social worker that she is incapable of appropriately caring for her newborn. M.T. was detained on May 25, 2020, pursuant to section 300, subdivisions (b), (g), and (j), and is not a party to this appeal.

In-person visitation with the child ceased in March 2020 because of the Governor's stay at home order for the Covid-19 pandemic; however, telephonic/video visitation continued. By July 2020, mother's visits were inconsistent (she did communicate with the child on May 4 & July 2); she explained that she sometimes simply forgets to visit the child via video chat. She also refused to provide DPSS with her current address. The social worker found mother's behavior following the birth of both of her children similar and opined that mother requires a conservator to assist and guide her with the daily tasks of living, in order that she not place herself in peril or

8

danger. The social worker later added that mother appears to have a very low tolerance for stress and frustration. The child was described as very loving and healthy, and his caregivers remained willing to adopt him and provide a permanent and safe home for him.

G.     *Sections 388 and 366.26 hearing.*

On August 25, 2020, mother made an oral motion pursuant to section 388, and requested another six months of services. Mother's counsel stated the motion was based on the fact that she provided this information regarding her psychiatric appointment, the medications she is taking, the fact that she will be working with a clinic regarding mental health services, the fact that she is working at a hospital, and the fact that she now has a new and stable residence.

Mother testified that she had been renting a room for $500 a month. She was working full-time at a hospital as a housekeeper. She was medication compliant, felt good, and no longer had anxiety attacks. She continued to see a therapist, a counselor, and a psychiatrist. Because of Covid-19, her visits with the child were telephonic because he does not stay still for video visits. She testified there is a bond between her and the child because she knows he loves her, and she loves him. She believed that she was in a position to care for him and she had family support, as well as support from a couple of people from her church.

Mother's counsel argued for another six months of services to allow for a clearer picture of her ability to regain custody of the child. The child's counsel acknowledged that mother's ability to care for herself is improving, but the ability to care for her child is

9

not. Counsel therefore asked the juvenile court to deny the 388 because mother has not shown changed circumstances, and she has not shown that it would be in the best interest of the child. DPSS concurred. The juvenile court denied the section 388 request, explaining there was no real evidence to suggest that there is any change of circumstances, and it would not be in the best interest of the child to provide additional services to mother.

Mother's counsel then argued the parental benefit exception set forth in section 366.26, subdivision (c)(1)(B)(i), applied and asked that legal guardianship be ordered as the appropriate permanent plan for the child. Counsel also requested mother's visitation remain consistent because of the strong bond she shared with the child. The child's counsel urged the juvenile court to follow the recommendations of DPSS, terminate parental rights, and select adoption as the permanent plan. However, she had no objection to the social worker talking to the caregivers about postadoption visitation. Again, DPSS concurred. The court found the beneficial exception to adoption did not apply, terminated parental rights, and ordered adoption as the permanent placement plan. The court directed DPSS to have a social worker discuss with the current caregiver the possibility of having future contact with mother and the minor child should that be found to be appropriate.

## II. DISCUSSION

A.     *Denial of the Oral Section 388 Petition.*

Mother argues the juvenile court abused its discretion by denying her request for additional services pursuant to section 388. We disagree.

Section 388 is a general provision permitting the juvenile court, "upon grounds of change of circumstance or new evidence, . . . to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." (§ 388, subd. (a)(1).) The statute allows the modification of a prior order only when the petitioner establishes by a preponderance of the evidence that (1) changed circumstances or new evidence exists, and (2) the proposed modification would promote the best interests of the child. (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1193; *In re Y.M.* (2012) 207 Cal.App.4th 892, 919-920.) A parent seeking relief under section 388 "must show *changed*, not changing, circumstances. [Citation.] The change of circumstances or new evidence 'must be of such significant nature that it requires a setting aside or modification of the challenged prior order.'" (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.)

Moreover, "'[i]t is not enough for a parent to show *just* a genuine change of circumstances under the statute. The parent must show that the undoing of the prior order would be in the best interests of the child.'" (*In re S.J.* (2008) 167 Cal.App.4th 953, 960.) A parent requesting an order for reunification services, after they have been terminated, has the burden of proving that the benefit to the child of reinstating services outweighs the benefit the child would derive from the stability of a permanent placement. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464.) We review the ruling on a section 388

11

petition for an abuse of discretion. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318.)[3]

Here, mother argues that she showed a change in her circumstances as evidenced by (1) participating in reunification services despite the fact they were terminated in January 2020, (2) obtaining a place to live (albeit beginning a few weeks prior to the section 366.26 hearing), (3) maintaining full-time employment, (4) complying with her medication, (5) adhering to her psychiatric schedules, (6) being emotional stable, and (7) obtaining support from her family and friends from church. While we commend mother for her continued efforts to attain mental and financial stability, the record demonstrates that she is neither stable nor ready to parent a child. While she attended her psychiatric appointments and was willing to participate in other services, she offered no evidence she was currently participating in parenting classes or counseling services.[4]

---

[3] In her opening brief, mother noted reviewing courts have evaluated a section 388 petition according to the factors set forth in *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530-532. She also noted that the *Kimberly F.* approach is not universally accepted for all cases. In fact, the very same court that decided *Kimberly F.* rejected the application of those factors when the juvenile court has terminated services and set a section 366.26 hearing for the selection of a permanent plan. "[W]e decline to apply the *Kimberly F.* factors if for no other reason than they do not take into account the Supreme Court's analysis in *Stephanie M*., applicable after reunification efforts have been terminated. As stated by one treatise, 'In such circumstances, the approach of the court in the case of . . . *Kimberly F*. . . . may not be appropriate since it fails to give full consideration to this shift in focus.' [Citation.] We instead follow the direction of our Supreme Court, holding that after reunification services have terminated, a parent's petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.) We too decline to apply the *Kimberly F.* factors in this case.

[4] According to mother, she went to her "old therapist" because no one had called her to make an appointment with a counselor at "another facility."

While she was currently compliant with her medication, the record shows that previously she was compliant until she forgot to have her prescription refilled. Also, mother previously obtained a place to live (with her cousin) but was unable to maintain it. While mother's prognosis appears favorable, we may not discount the social worker's observations that mother has a low tolerance for stress and frustration; she remained unaware of subtle environmental dangers that posed a risk to the child; she would rarely, if ever, redirect the child when he was doing potentially dangerous things; and her second child was detained on May 25, 2020, less than two months after his birth. At most, mother has shown that her circumstances were changing, but had not changed. (*In re Ernesto R*. (2014) 230 Cal.App.4th 219, 223 ["[T]he change in circumstances must be substantial."].)

Furthermore, mother is unable to demonstrate that a new order was in the best interests of the child. We do not doubt mother's enormous and unconditional love for her child and her constant commitment to spending time with him. However, we do not agree that providing her with another six months of reunification services in order to allow a clearer picture of her ability to regain custody would be in the child's best interests. Mother fails to show how her request would advance his need for permanency and stability. The child was removed from her care 17 days after his birth, and by the time of the sections 388/366.26 hearing, he was two years three months old. Mother had received 18 months of services but failed to reunify with him, let alone progress to unsupervised visitation. During this same time, the child had bonded with his caregivers and their extended family members, and he was thriving in their home. His caregivers

loved him and provided for all his needs. The child looked to his caregivers and their family members for comfort and when he wanted to be held. Moreover, "[a]fter the termination of reunification services, the parents' interest in the care, custody and companionship of the child [is] no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability.'" (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) The court here recognized this shift of focus in determining the ultimate question—what are the best interests of the child?

In view of the circumstances, it is difficult to see how reinstating mother's services would be in the child's best interests. He was bonded to his caregivers who wanted to adopt him. Mother's compliance with her case plan was ongoing, and she was unable to show how reinstating reunification services outweighed the benefit the child would derive from the stability and security of a permanent home. Under these circumstances, the juvenile court did not abuse its discretion in denying mother's section 388 petition.

B.      *Termination of Parental Rights.*

Mother argues the juvenile court erred in failing to apply the beneficial parental relationship exception to the termination of parental rights under section 366.26, subdivision (c)(1)(B)(i). We disagree.

At a permanency planning hearing, once the juvenile court finds by clear and convincing evidence that a child is likely to be adopted within a reasonable time, the court is required to terminate parental rights and select adoption as the permanent plan, unless the parent shows termination of parental rights would be detrimental to the child under one of several statutory exceptions. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308,

14

1314.) One exception is the beneficial parent-child relationship exception. (§ 366.26, subd. (c)(1)(B)(i).)

"'To trigger the application of the parental relationship exception, the parent must show the parent-child relationship is sufficiently strong that the child would suffer detriment from its termination.' [Citation.] A beneficial relationship 'is one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." [Citation.] The existence of this relationship is determined by "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs."'" (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.) Thus, the nature of the relationship between the parent and child is crucial in determining the existence of a beneficial parent-child relationship exception; it is not sufficient to show that the child derives some benefit from the relationship or shares some "'emotional bond'" with the parent. (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.) "To overcome the preference for adoption and avoid termination of the natural parent's rights, the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) In other words, the parent must show he or she occupies a "'parental role'" in the child's life. (*In re K.P.*, at p. 621.)

15

Appellate courts are divided over the appropriate standard of review for an order determining the applicability of the beneficial parent-child relationship exception.[5]  We review the juvenile court's findings on the existence of the relationship for substantial evidence.  (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.)  Whether "the relationship is a 'compelling reason' for finding detriment to the child" is a "'quintessentially' discretionary decision" that we review for abuse of discretion.  (*Id*. at p. 1315; see *In re J.S.* (2017) 10 Cal.App.5th 1071, 1080 [applying hybrid standard of review to sibling bond exception].)  This record supports the juvenile court's conclusion that the beneficial parent-child relationship exception did not apply.

Here, there is no question mother fulfilled the first prong of the beneficial parent-child relationship exception, as she consistently visited the child.  Thus, the issue before us is whether she met her burden on the second prong—that the child would benefit from continuing the parent-child relationship.  We do not find the evidence favoring mother's position compelled the juvenile court to find the exception applied or that this is one of the extraordinary cases where this exception should have been applied.

Again, we do not dispute that mother loves her child "intensely."  However, there is simply no evidence that establishes her relationship with the child promoted his well-being to such an extent that it outweighed the well-being he would gain in a permanent home with an adoptive parent.  The child was 17 days old at the time he was removed from mother's custody and, since removal, he has never lived with mother or stayed with

_____

[5]  The issue is currently pending before our Supreme Court in *In re Caden C.* (2019) 34 Cal.App.5th 87, review granted July 24, 2019, S255839.

her overnight. In contrast, he has spent all but 17 days of his life living with his caregivers, who have consistently occupied parental roles in his life.

Mother contends the facts in her case are similar to those in *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*). There, a three-year-old child was removed from her father's custody; the father immediately acknowledged his drug use, fully complied with his case plan, and remained drug free. (*Id*. at p. 298.) Even after a year apart, the child wanted to live with his father and became upset when visits ended. (*Ibid*.) The appellate court reversed the termination of parental rights, finding substantial evidence that the beneficial parent-child relationship exception applied. (*Id*. at pp. 298-299.) The court concluded: "[T]he only reasonable inference is that S.B. would be greatly harmed by the loss of her significant, positive relationship with [her father]." (*Id*. at p. 301.)

Mother's comparison of her situation to that of the father in *S.B.* is misplaced for several reasons. First, mother did not make consistent efforts to alleviate or mitigate the reasons the child was brought to the attention of the juvenile court. In fact, when the child was two years old, mother's second child was removed from her custody for the same reasons her first child was removed. Second, the child was removed from mother's care when he was 17 days old, while S.B. was removed at the age of three years. Third, a bonding study was conducted in *S.B.*, and the doctor concluded there was a potential for harm to S.B. if the parent-child relationship was lost. (*S.B*., *supra*, 164 Cal.App.4th at p. 296.) And fourth, mother's social worker never opined that the child would suffer detriment if mother's parental rights were terminated. Moreover, *S.B.* is confined to its "extraordinary facts." (*In re C.F*. (2011) 193 Cal.App.4th 549, 558.)

17

The same court that decided *S.B.* later stated that *S.B.* "does not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact. As [*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575] points out, contact between a parent and child will always 'confer some incidental benefit to the child,' but that is insufficient to meet the standard." (*In re C.F.*, at pp. 558-559.)

Relying on *In re E.T.* (2018) 31 Cal.App.5th 68, mother argues that the juvenile court may not terminate parental rights based upon an unenforceable expectation that the prospective adoptive parents will voluntarily permit future contact. However, the court did not rely upon any potential future contact in terminating parental rights. Even if it did, any posttermination visitation order is not the equivalent of a finding that termination of parental rights would be detrimental, and it is necessarily limited to the time period until the child is adopted, after which visitation would be subject to a postadoption contact agreement.

Even if we assume the child enjoyed visiting with mother, the strong statutory preference for adoption prevails by the time of the section 366.26 hearing to ensure permanency and stability for the child. While mother cares deeply for her son and is working on addressing the issues that necessitated the juvenile court's intervention, there is no evidence he would be "*greatly* harmed" by the termination of his natural parent-child relationship with her. (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 466.) We therefore conclude she has not shown that the court's findings lack the support of substantial evidence or that its exercise of discretion rested on an unsupported factual

basis.  In short, the court properly found the parent-child relationship exception to adoption did not apply.

### C.    *Legal Guardianship*

Mother also contends the juvenile court should have ordered legal guardianship, as opposed to adoption, as the permanent plan.  We disagree.

Under section 366.26, subdivision (b)(1), the statutory preference is to terminate parental rights and order the child placed for adoption.  "The Legislature has thus determined that, where possible, adoption is the first choice . . . 'because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.]  'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.'"  (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)  Because the child was living with caregivers who were committed to adopting him, and the beneficial relationship exception did not apply to preclude adoption, "it necessarily follows that the

juvenile court correctly determined that adoption was the appropriate permanent plan for [him]." (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1420.)[6]

## III.  DISPOSITION

The juvenile court's orders denying mother's section 388 petition, terminating parental rights, and freeing the child for adoption are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<table>
<tr><td></td><td>McKINSTER_____</td></tr>
<tr><td></td><td>Acting P. J.</td></tr>
</table>

We concur:

MILLER_____
               J.

FIELDS_____
               J.

---

[6]  This case is not similar to *In re Scott B.* (2010) 188 Cal.App.4th 452, 471-472. In that case, the mother provided stability to the life of the 11-year-old child, which is "what adoption is supposed to do, but it may not in this case." (*Id*. at p. 472.)  "Given [the child's] strong emotional attachment to [his mother], his continued precarious emotional state, and his history of regressing and running away when he is stressed, there is a very good chance that he will have a meltdown if his usual frequent visitation with [his mother] does not continue.  The only way to avoid that serious emotional and developmental setback and ensure that [the child's] usual visitation with [his mother] continues is by court order.  The only way to have such an order is to have [the child's] permanent plan be legal guardianship or long-term foster care. . . .  The record demonstrates that adoption, with its inherent possibility that [the child's] usual contacts with [his mother] would be interrupted, poses the chance of a danger not worth taking." (*Ibid*.)